## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KASHEYON LEE-CHIMA,** | **:** | |
| **Plaintiff** | **:** | **CIVIL ACTION NO. 1:20-2349** |
| **v.** | **:** | **(JUDGE MANNION)** |
| **K. HUGHES, _et al_.,** | **:** | |
| **Defendants** | **:** | |

## <u>MEMORANDUM</u>

Plaintiff Kasheyon Lee-Chima, an inmate in state custody who was formerly confined at the State Correctional Institution in Waymart, Pennsylvania (SCI Waymart), filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983.[1] He alleges that several prison officials violated his Eighth and Fourteenth Amendment rights with respect to a use-of-force incident that occurred in 2019.

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the Court will grant Defendants' Rule 56 motion.

---

[1] Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. _See_ Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).

## I. BACKGROUND[2]

Lee-Chima's Section 1983 lawsuit revolves around events that occurred during a use-of-force incident on April 4, 2019. In his original and amended complaints, he had asserted additional claims regarding a 90-day placement in disciplinary segregation in the Restricted Housing Unit (RHU), as well as a loss-of-property incident that occurred on April 5, 2019. (See Doc. 58 at 2-3). The Fourteenth Amendment claims related to disciplinary segregation and loss of personal property, however, were dismissed with prejudice for failure to state a claim upon which relief may be granted. (See

---

[2] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. "Statements of material facts in support of, or in opposition to, a motion [for summary judgment] shall include references to the parts of the record that support the statements." Id. Defendants filed a properly supported statement of material facts. (See Doc. 132). Lee-Chima responded to this statement, but his counterstatements of fact frequently lack citation to record evidence and instead contain nothing more than argument or allegations. (See, e.g., Doc. 144 ¶¶ 5, 7, 9, 15, 21, 22, 23, 31). This directly contravenes Local Rule 56.1 and frustrates proper resolution of a motion for summary judgment. See Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613 (3d Cir. 2018) (explaining that Local Rule 56.1 "is essential to the Court's resolution of a summary judgment motion due to its role in organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." (emphasis added) (internal quotation marks and citations omitted)). Accordingly, Defendants' statements of material facts that are not properly disputed by Lee-Chima are deemed admitted unless plainly contradicted by the record. See LOCAL RULE OF COURT 56.1.

id. at 12-16, 21-22; Doc. 59 ¶ 1(b)).[3] Thus, the gravamen of Lee-Chima's lawsuit concerns events surrounding a single use-of-force incident.

Although many details are in dispute, it is agreed that on April 4, 2019, defendants Kenneth Hughes, Paul McHugh, and Erin Van Buren—corrections officers of various rank stationed at SCI Waymart—were involved in a use-of-force incident with Lee-Chima. (See Doc. 132 ¶¶ 1-7; Doc. 144 ¶¶ 1-7; see also Doc. 72 at 4). According to Defendants, after Lee-Chima "became argumentative with correctional staff" in the dining room, Hughes directed Lee-Chima to exit the dining room and to place his hands on the wall for a pat search. (Doc. 132 ¶¶ 2-3). Defendants aver that Lee-Chima "resisted and came off the wall" during the pat search and had to be restrained by Hughes and McHugh. (Id. ¶¶ 4-5). Hughes, McHugh, and Van Buren then moved Lee-Chima away from the dining room to the west corridor hallway "for safety and security concerns." (Id. ¶ 6). Additional corrections officers then responded to the west corridor hallway and escorted Lee-Chima to the RHU. (Id. ¶ 7).

---

[3] The Court additionally denied several motions for reconsideration Lee-Chima filed concerning dismissal of his Fourteenth Amendment procedural due process claim. (See Docs. 62, 66, 68, 69).

Lee-Chima tells a drastically different version of events. According to the second amended complaint, on the day in question, Hughes approached him in the dining room and "without any proper reason or justification" began to verbally harass him. (Doc. 72 ¶¶ 3-4). Lee-Chima avers that he remained calm and respectful despite the verbal abuse, and when he had finished his meal and was given permission to exit, he left the dining room in a normal manner. (Id. ¶¶ 7-8). Upon exiting the dining room, Lee-Chima alleges that Hughes and McHugh were waiting for him in the hallway, and Hughes ordered him to assume "pat search formation." (Id. ¶ 9). Lee-Chima further avers that Hughes continued making abusive, threatening, and derogatory remarks toward him with respect to Lee-Chima's race "(as a Hispanic-mixed male)" and sexual orientation "(as a gay male)." (Id. ¶¶ 10-11).

Instead of conducting a normal pat search, Lee-Chima alleges that Hughes issued "conflicting" and "confusing" verbal directions. (Id. ¶ 13). Hughes allegedly first ordered Lee-Chima into a "pat search formation," but then ordered him to take his hands off the wall, followed by another order to put his hands "up" into the air. (Id.) Lee-Chima maintains that he followed these orders despite their purportedly confusing nature. (Id.) He then claims that he "looked over his left shoulder" in an attempt to view Hughes (who he

claims was continuing to verbally harass him), and in response he was "physically battered" by Hughes and McHugh when they "aggressively tackled and pinned [him] to the wall." (Id. ¶¶ 14-15). He then claims that both Hughes and McHugh "began striking, punching, and slugging" him in his "neck, back, shoulders, arms, legs, stomach, ribs (side), and other areas" without any cause or justification. (Id. ¶¶ 17-18).

Lee-Chima further alleges that Van Buren witnessed the assault by Hughes and McHugh and failed to take any action to stop the purported use of excessive force. (Id. ¶¶ 19-20). Instead, according to Lee-Chima, Hughes, McHugh, and Van Buren handcuffed him and moved him to a different location down a hallway to avoid being seen by bystanders, where they once more "physically battered" him by "forcefully pinning [his] face onto a bar gate" and delivering "several strikes[] and punches to his body (in numerous locations)." (Id. ¶¶ 23-25). During this second alleged assault, Lee-Chima avers that Hughes continued to verbally harass him with "racial and homophobic remarks" and took the additional step of "fondling [him] by grabbing [his] buttocks and squeezing it." (Id. ¶¶ 26-27).

After being escorted to the RHU and placed in disciplinary segregation, Lee-Chima asserts that his requests for medical attention were denied. (Id.

¶ 32). He alleges that he made verbal requests for medical treatment to Defendants, as well as to other corrections officers who were involved in the escort, but those requests were ignored or denied. (Id. ¶¶ 32-34).

Lee-Chima's second amended complaint asserts the following Section 1983 claims based on the foregoing allegations: (1) Eighth Amendment excessive force against Hughes, McHugh, and Van Buren; (2) Eighth Amendment failure to intervene against Van Buren; (3) Fourteenth Amendment equal protection against Hughes; and (4) Eighth Amendment deliberate indifference to serious medical needs against Hughes, McHugh, and Van Buren. (Id. at pp. 5-13). He seeks compensatory and punitive damages, a declaration that his constitutional rights were violated, and injunctive relief in the form of Defendants being terminated from their employment. (See id. at pp. 17-18).

Lee-Chima also attempts—once again—to assert a Fourteenth Amendment procedural due process claim against hearing examiner C.J. McKeown. (See id. ¶¶ 40-53). That claim, however, was dismissed with prejudice at the Rule 12(b)(6) stage because Lee-Chima had not, and could not, plausibly allege an "atypical and significant hardship" based on his punishment of 90 days' disciplinary segregation. (See Doc. 58 at 12-14, 21-

22; Doc. 59 ¶ 1(b)). Lee-Chima's subsequent motions for reconsideration on this issue were repeatedly denied, with the Court thoroughly explaining (and re-explaining) to Lee-Chima why he had not identified a protected liberty interest and thus could not state a procedural due process claim. (See Docs. 62, 66, 68, 69). Moreover, Lee-Chima was explicitly directed to omit this claim from any second amended complaint, (see Doc. 58 at 22), but failed to adhere to the Court's directions. Accordingly, no further discussion of this procedural due process claim is necessary or warranted.

Following lengthy and extensive discovery, Defendants move for summary judgment on all remaining Section 1983 claims. (Doc. 126). Their motion is fully briefed and ripe for disposition.

## II. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Thus, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual dispute exists. Anderson, 477 U.S. at 248. Rather, the nonmovant "must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B).

In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992). Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party. Daubert v. NRA Grp., LLC, 861

F.3d 382, 391 (3d Cir. 2017) (quoting Berkeley Inv. Grp. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)).

## III. DISCUSSION

Defendants move for summary judgment on all remaining Section 1983 claims. They argue that Lee-Chima failed to exhaust administrative remedies as to any claim.  Alternatively, they assert that Lee-Chima's claims fail on the merits or are barred by qualified immunity. The Court begins, as it must, with the issue of exhaustion of administrative remedies.

### A. Administrative Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e et seq., requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations. See 42 U.S.C. § 1997e(a); Ross v. Blake, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted). Proper exhaustion is mandatory, even if the inmate is seeking relief—like monetary damages— that cannot be granted by the administrative system. Woodford v. Ngo, 548 U.S. 81, 85 (2006). Failure to properly exhaust generally results in the claim being procedurally defaulted and unreviewable. See Spruill v. Gillis, 372 F.3d

218, 230 (3d Cir. 2004). The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007); see also Woodford, 548 U.S. at 90-91.

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases. See Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305-06 & n.4 (3d Cir. 2020); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804"). If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based." DC-ADM 804 § 1(A)(3)-(5), (8). An adverse decision by the grievance coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection. Id. § 2(A)(1). Finally, an adverse decision by the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision. Id. § 2(B)(1).

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other conditions, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the inmate "specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance sets forth "the specific relief sought," including "compensation or other legal relief normally available from a court." Id. § 1(A)(11).

It is undisputed that there is only one grievance Lee-Chima filed under DC-ADM 804 that is relevant to the instant lawsuit: grievance number 796853. (See Doc. 132 ¶ 18; Doc. 132-1 at 42; Doc. 144 ¶ 18). That grievance is dated April 11, 2019, and states as follows:

> On 04-04-19 at approximately 1745 hrs (5:45 pm) I was attacked from behind by two Officers (Sgt. K. Hughes and C/O McHugh) during what was thought to be a random pat search. I had my hands on the wall and feet spread apart when suddenly I was tackled and pinned to the wall. While being assaulted, those officers used very vulgar, obscene language, shouting discriminating [sic] and racial slurs. After the attack, I was then sent to the RHU to await my hearing.

The hearing examiner stated that the video was obstructed and tampered and therefore omits any assaults from either party. However, the examiner still found me guilty and sentenced me to 90 days in the RHU. I was unjustly found guilty of assault and #33—using abusive language. I found it [sic] that Justice was not served because video obstruction shouldn't fall on the negligence of the inmate but on the facility. I was the individual assaulted.

I reported the assault to medical, psychological, RHU staff and to the Facility Chaplain Director (Rabbi) and also the Protestant Chaplain (Mr. Johnson) who all observed my bruises, swellings [sic], and marks received from the assault. I am requesting that this sentenced [sic] be overturned and that I be released from RHU[.] I shouldn't be found guilty of something I didn't commit. PERIOD!

(Doc. 132-1 at 47 (emphasis and grammar in original)).

From the face of Lee-Chima's grievance, several irrefutable conclusions regarding exhaustion can be drawn. The Court will discuss these conclusions in turn.

### 1. No Claim Raised or Exhausted Against Van Buren

First, Lee-Chima never identified Van Buren or grieved any claim against her, as required by DC-ADM 804 § 1(A)(11)(b). There is no mention of Van Buren by name or position, nor is there a reference to any corrections officer other than Hughes and McHugh who allegedly assaulted Lee-Chima or failed to intervene in an assault on April 4, 2019. Lee-Chima did not allege,

for example, that an "unidentified" or "Jane Doe" prison official was involved in the incident, or that any other officer besides Hughes and McHugh acted in an unprofessional or unconstitutional manner. Indeed, at no point did Lee-Chima provide DOC officials with any indication that a third corrections officer was allegedly involved in the use-of-force incident, failed to intervene to protect him, or otherwise violated his rights.

Lee-Chima argues that he did not know Van Buren's identity until discovery in the instant lawsuit, and therefore he could not have grieved any claims against her. (Doc. 144 ¶ 19). This argument fails for two reasons.

First, Lee-Chima was made aware of Van Buren's identity and involvement mere hours after the incident. In the April 4, 2019 misconduct report (# D-030917), Hughes—the author of the misconduct—specifically stated that both McHugh and "CO Vanburen" (who was "posted on West Corr[idor]") assisted in restraining Lee-Chima. (Doc. 34-1 at 2; Doc. 142-1 at 4). Lee-Chima acknowledges that he was provided with a copy of this misconduct report approximately three hours after the incident. (See Doc. 72

¶ 42). Thus, he was fully apprised of the identity and involvement of Van Buren prior to filing his grievance on April 11, 2019.[4]

Second, Lee-Chima always had the option to allege that an "unidentified," "unknown," or "Jane Doe" corrections officer assaulted him or failed to intervene in an assault. This would have placed the onus on the DOC to investigate and potentially identify the third officer during the grievance process. See, e.g., Diaz v. Palakovich, 448 F. App'x 211, 217 (3d Cir. 2011) (nonprecedential) (determining that inmate's identification of "mailroom staff," along with grievance officer's subsequent interview of mailroom employees, obviated any procedural default that may have resulted from failure to specifically name mailroom employees).

But this is not what Lee-Chima did. Rather, he explicitly alleged that two—and only two—corrections officers were involved in the use-of-force incident, and he identified them both by name. (See Doc. 132-1 at 47). Thus, there was no occasion for prison administrators to investigate or determine if another corrections officer was involved in the incident or had acted unlawfully.

---

[4] The Court additionally observes that in his initial complaint, Lee-Chima named (or attempted to name) Van Buren as a defendant. (See Doc. 1 at 12 ("List of Defendants")). This further undercuts his claim that he did not learn Van Buren's identity until discovery.

Accordingly, Lee-Chima procedurally defaulted any claim asserted in the instant lawsuit against Van Buren. With no excuse for that default, summary judgment must be granted in Van Buren's favor because Lee-Chima is barred from bringing those unexhausted claims in federal court. See Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir. 2004); Downey, 968 F.3d at 304-05; 42 U.S.C. § 1997e(a).

### 2. No Equal Protection or Medical Claims Raised

A second conclusion that can be drawn from the face of grievance 796853 is that Lee-Chima did not assert any type of medical indifference or equal protection claim against Hughes or McHugh (or any other prison official). Nothing in the grievance discusses delayed or denied medical treatment, a denied request for medical care, inappropriate or deficient medical treatment, or any other reference that could be construed as alleging deliberate indifference to serious medical needs.

Additionally, even under liberal construction, the grievance cannot be interpreted as asserting an equal protection claim against Hughes or McHugh. After learning that mere verbal harassment with discriminatory language (like racial or homophobic slurs) is insufficient to plausibly allege an equal protection violation, (see Doc. 58 at 17-18 (discussing insufficiency

of Lee-Chima's equal protection allegations in first amended complaint)),
Lee-Chima altered his allegations. In his second amended complaint, he
claims that Hughes "fondled" him during a second alleged assault that
occurred when he was moved down the hallway after the initial assault
outside of the inmate dining room. (See Doc. 72 ¶¶ 23, 26-28). Nothing about
a *second* assault or groping appears in Lee-Chima's grievance.

Even if the second amended complaint can be liberally construed as
alleging that Lee-Chima was invidiously discriminated against by being
assaulted during the initial search because of his race or sexual orientation,
no such claim appears in grievance 796853. At no point did Lee-Chima use
the phrase "equal protection" or assert that he had been treated differently
than other inmates based on his race or sexual orientation. At most, he
alleged that Hughes and McHugh used "very vulgar, obscene language,"
which included "discriminating [sic] and racial slurs." (Doc. 132-1 at 47). This
single sentence is insufficient to put prison officials on notice that Lee-Chima
was attempting to assert an equal protection violation under the Fourteenth
Amendment. Yet DC-ADM 804 expressly requires aggrieved inmates to
"specifically state any claims he/she wishes to make concerning violations of

Department directives, regulations, court orders, or other law." DC-ADM 804 § 1(A)(11)(c).

Thus, contrary to Lee-Chima's contention, (see Doc. 144 ¶ 20), it is far from "evident" that he intended to assert an equal protection claim in his grievance. Furthermore, the citation he provides does not support his argument that he asserted an equal protection claim in other administrative proceedings. Lee-Chima points to his written statement given on April 19, 2019, during the DC-ADM 001 abuse investigation. (See id. (citing Doc. 132-3 at 18)). That statement is nearly identical to his grievance, does not assert an equal protection claim, and directly contradicts the allegations in his second amended complaint of a second assault. (See Doc. 132-3 at 19 ("After I was taken away from [the inmate dining room] and relocated out of sight from other inmates[,] those two officers [Hughes and McHugh] no longer aggressively handled me.")).

Even if Lee-Chima *had* asserted an equal protection claim in his DC-ADM 001 filings (or in a PREA report), his exhaustion argument would still fail. The United States Court of Appeals for the Third Circuit has expressly addressed this issue and held that DC-ADM 804 is the "exclusive means of exhaustion" for most legal claims against state prison officials. See Prater v.

Dep't of Corr., 76 F.4th 184, 203-04 (3d Cir. 2023); Everett v. Robinson, No. 22-2890, 2023 WL 6458850, at *2 (3d Cir. Oct. 4, 2023) (nonprecedential). Section 1983 claims regarding a violation of the Fourteenth Amendment's Equal Protection Clause must be exhausted through DC-ADM 804; they are not excepted from the general grievance process. See Prater, 76 F.4th at 204 (citing DC-ADM 804 § 1(A)(2), (7)). The same applies for claims of excessive force and deliberate indifference to serious medical needs. See id. at 191-92, 204. Thus, Lee-Chima's argument that he used DC-ADM 001 to exhaust his Section 1983 claims is unavailing.

Finally, Lee-Chima's own grievance filings undercut his after-the-fact assertion that he intended to grieve a Fourteenth Amendment equal protection claim or a medical indifference claim. In his appeal to the Facility Manager—the second step in the DC-ADM 804 exhaustion process—Lee-Chima expressly states, "On 04-11-2019, I submitted and filed a grievance #796853 regarding an intentional tort (assault) by two Correctional Officers: SGT. K. Hughes and C.O. McHugh." (Doc. 132-1 at 49). In a follow-up request about that appeal, Lee-Chima again stated: "On 04-11-2019, I submitted a grievance regarding inmate abuse where I had been assaulted by two officers." (Id. at 45). There is simply nothing in these appeal

documents that would indicate that Lee-Chima was asserting or pursuing an equal protection claim, a medical indifference claim, or an Eighth Amendment claim against Van Buren. Rather, Lee-Chima's appeal paperwork confirms what is found in all other administrative documents contemporaneous to the alleged assault: Lee-Chima grieved a singular excessive force incident (which occurred outside the inmate dining room) against two specific and identified corrections officers.[5]

### 3. Requested Relief

A third conclusion that is easily drawn from the face of Lee-Chima's grievance is that he did not request monetary damages, declaratory relief, or injunctive relief involving the termination of DOC employees. Rather, his single request for relief was that his disciplinary segregation sentence "be overturned and that [he] be released from [the] RHU." (Doc. 132-1 at 47).

The law is clear that Lee-Chima is thus barred from pursuing monetary damages or any type of declaratory or injunctive relief that he did not request in his initial grievance. See Wright v. Sauers, 729 F. App'x 225, 227 (3d Cir.

---

[5] Grievance number 796853 also includes language that could implicate a Fourteenth Amendment procedural due process claim. (See Doc. 132-1 at 47 (discussing hearing examiner's findings and punishment and alleging that he was wrongfully found guilty of the misconduct)). But as noted above, Lee-Chima's procedural due process claim has been dismissed with prejudice and is irrelevant to the instant Rule 56 motion.

2018) (nonprecedential) (noting that revised version of DC-ADM 804 requires administrative exhaustion for all forms of relief sought (including monetary damages), and failure to request such relief in initial grievance results in procedural default thereof); DC-ADM 804 § 1(A)(11)(d). As Lee-Chima's disciplinary segregation sentence has long since expired, the only remaining potential relief available in the instant lawsuit is expungement of the misconduct.[6]

### 4. Excessive Force Claims

Defendants contend that even the excessive force claims that Lee-Chima did assert in his initial grievance are procedurally defaulted because he did not appeal to final review with the SOIGA. Under the facts of this case, Defendants are incorrect.

Grievance number 796853 plainly asserts excessive force claims against Hughes and McHugh.[7] That initial grievance was marked "rejected"

---

[6] It is possible that nominal damages may be available as well. The Court observes that under binding Third Circuit precedent, nominal damages do not need to be alleged in the complaint. See Mitchell v. Horn, 318 F.3d 523, 533 n.8 (3d Cir. 2003) (citing Allah v. Al-Hafeez, 226 F.3d 247, 251 (3d Cir. 2000)). Consequently, it is unclear whether a request for nominal damages must be administratively exhausted.

[7] Although Lee-Chima's grievance appeal documents state that he was alleging the intentional tort of "assault," (see Doc. 132-1 at 49), the allegations in the initial grievance clearly implicate an Eighth Amendment excessive force claim.

by the Facility Grievance Coordinator on April 16, 2019, explaining only that "[y]our grievance was turned over to the Security Department for further investigation." (Doc. 132-1 at 46). Lee-Chima timely appealed this response on April 29, 2019, maintaining that his grievance should not have been rejected but instead marked as under investigation. (See Doc. 132-1 at 48, 49).

The Facility Manager, however, failed to respond to Lee-Chima's appeal until July 22, 2019. (See id. at 44). In his eventual response, the Facility Manager upheld the initial grievance response and affirmed the grievance as "rejected/denied." (Id.) However, this appeal response was far too late. Under DC-ADM 804, unless additional time is requested, the Facility Manager must provide a response to an appeal within 15 working days of the date it is received. See DC-ADM 804 § 2(A)(2)(c), (d)(1), (d)(4). Thus, because the Facility Manager failed to comply with the DOC's own grievance policy, exhaustion was rendered complete. See Shifflett v. Korszniak, 934 F.3d 356, 365-66 (3d Cir. 2019). Consequently, Lee-Chima was not required to appeal to final review with the SOIGA to exhaust the claims asserted in his initial grievance.

Nevertheless, as noted above, the only relevant claims in this lawsuit that Lee-Chima raised in his initial grievance (and pursued on appeal) sound in excessive force against Hughes and McHugh for the initial incident that occurred outside the inmate dining room. The Court therefore turns to the merits of those exhausted Eighth Amendment claims.

### B. Eighth Amendment Excessive Force

In a Section 1983 claim for excessive force, the "pivotal inquiry" is whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Ricks v. Shover, 891 F.3d 468, 480 (3d Cir. 2018) (quoting Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002)). The factors analyzed when making this inquiry include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response." Id. (quoting Smith, 293 F.3d at 649). The Eighth Amendment, however, "does not protect an inmate against an objectively *de minimis* use of force." Smith, 293 F.3d at 649 (citation omitted).

If this case were limited to the competing versions of events proffered by Lee-Chima and Defendants, as recounted in Section I above, there would be a dispute of material fact regarding whether Hughes or McHugh employed excessive force during the April 4, 2019 incident. But the Rule 56 record is not so limited. Rather, there is video evidence of the incident in question that is fatal to Lee-Chima's contention that he was subjected to excessive force by Hughes and McHugh. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Recall that Lee-Chima avers—in his verified second amended complaint—that he was "physically battered" by Hughes and McHugh when they "aggressively tackled and pinned [him] to the wall." (Doc. 72 ¶¶ 14-15). He alleges that both Hughes and McHugh "began striking, punching, and slugging" him in his "neck, back, shoulders, arms, legs, stomach, ribs (side), and other areas" without any cause or justification. (Id. ¶¶ 17-18).

These accusations, however, are refuted by video footage of incident. In the CCTV footage captured outside the inmate dining room, Lee-Chima

can be seen exiting the dining room and assuming a pat search position against the wall, as directed by Hughes. (See Doc. 132-4, "Video 1 – IDR1" at 0:25-33). McHugh approaches and stands to the right of Lee-Chima. (Id. at 0:33-40). Hughes begins the pat search on Lee-Chima and can be seen speaking to him for several seconds (although the video contains no audio). (Id. at 0:33-44). Lee-Chima is then seen taking his hands off the wall and turning his head back toward Hughes and there is a brief struggle, during which Hughes (and possibly McHugh) appear to hold Lee-Chima against the wall and bring his arms down to place him in handcuffs. (Id. at 0:45-1:03). Several other corrections officers are present and monitoring the interaction but do not take any action. (Id.) After Lee-Chima is handcuffed, he is led away from the dining room toward the camera, flanked by Hughes and McHugh and with Van Buren following closely behind. (Id. at 1:04-13). He ambulates without difficulty and does not appear upset or injured. (Id.)

At no time in this video was Lee-Chima "tackled" or taken to the ground. Nor is there any indication that Hughes and McHugh were "striking, punching, and slugging" Lee-Chima in his "neck, back, shoulders, arms, legs, stomach, ribs (side), and other areas." Rather, upon thorough review of the relevant few seconds of the video, such allegations appear to be post-

hoc embellishment by Lee-Chima. Although the video is not of exceptional quality, it certainly does not show Lee-Chima being repeatedly punched all over his body by Hughes and McHugh. Indeed, it is rather implausible that Defendants could unleash such a comprehensive assault in the 15 or so seconds at issue, during which time Defendants also had to physically restrain and handcuff Lee-Chima. Rather, what the video shows is that Defendants pushed and held Lee-Chima against the wall and put him in handcuffs.

Furthermore, Lee-Chima's more egregious accusations do not even appear in his DC-ADM 001 abuse investigation statement or DC-ADM 804 grievance. For example, in his DC-ADM 001 statement made shortly after the incident, he alleged that he was "tackled and pinned to the wall where [he] was being aggressively manhandled." (Doc. 132-3 at 3, 19). This statement, like his grievance, contains no mention of being "punched" or "struck" or "slugged" all over his body by Hughes and McHugh—allegations that, if true, would be highly relevant for an abuse investigation or a grievance alleging an "attack" by corrections officers.

Additionally, even when viewing the facts in a light most favorable to Lee-Chima, he suffered only extremely minor injuries from this use-of-force

incident. According to the record evidence cited by Lee-Chima, the application of force caused bruising and swelling to his right inner arm. (See Doc. 144 ¶¶ 12, 16-17 (citing Doc. 98-1[8]; Doc. 132-3 at 3, 21, 32, 51)). He also complained to a medical provider on April 17, 2019, that he had bruising and swelling on his neck (in addition to his right arm), but "nothing [was] present" during the examination. (Doc. 132-3 at 49). The related photograph of Lee-Chima's neck shows no evidence of any bruising, swelling, or other mark. (See id. at 53).

Thus, although Lee-Chima alleges that there were "many bruises and marks" on his body, none of the evidence to which he points supports this claim. (See Doc. 144 ¶¶ 12, 16-17 (citing Doc. 98-1; Doc. 132-3 at 3, 21, 32, 51); Doc. 142 at 33 (citing Doc. 132-3 at 49-53)). The extremely minor degree of injury reflected in the record, while not dispositive, lends further support to

---

[8] As part of Document 98-1, Lee-Chima cites to "Kolakowski Subpoena Response __Lee-Chima__001-003" several times. (See Doc. 144 ¶¶ 12, 13, 16, 17). These Bates-stamped documents, however, do not appear in Document 98-1. It is possible that Lee-Chima is referring to CM/ECF Document 142-2 ("Exhibit: B") at pages 4 through 6, which appears to be an April 16, 2019 report from "Joseph Kolakowski" that Lee-Chima submitted as part of his Rule 56 briefing. (See Doc. 142-2 at 4-6). If this is the document Lee-Chima is referencing, it is unclear why he did not cite to his own Rule 56 exhibit in his briefing. In any event, the report states that during Kolakowski's RHU rounds on April 5, 2019, Lee-Chima "reported to me that he was injured when several officers were searching him, and he showed me marks on his body that he claimed were bruises from this alleged incident." (Id. at 4, 5). Kolakowski's statement does not provide any additional evidence that Lee-Chima suffered anything other than very minor injuries from the use-of-force incident.

- 26 -

an absence of excessive force. See Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010) (explaining that extent of injury suffered by inmate can provide an "indication of the amount of force applied" (citation omitted)).

At bottom, whatever small amount of force that Hughes and McHugh utilized to restrain and handcuff Lee-Chima (as reflected in the video of the incident outside the inmate dining room) is objectively *de minimis* and does not rise to the level of a constitutional violation. See, e.g., Washam v. Klopotoski, 403 F. App'x 636, 640 (3d Cir. 2010) (nonprecedential) (finding that knocking books out of inmate's hand, "slamming" him to the ground, and handcuffing him, which resulted in abrasions on prisoner's shoulder and knee, was *de minimis* use of force); Reyes v. Chinnici, 54 F. App'x 44, 47-49 (3d Cir. 2002) (nonprecedential) (finding that a single punch to a handcuffed prisoner was *de minimis* force); Jamison v. Varano, No. 1:12-CV-1500, 2015 WL 4662696, at *7 n.3 (M.D. Pa. Aug. 6, 2015) (finding *de minimis* force where inmate was pushed into a wall and restrained in handcuffs, with no discernable injury); Longendorfer v. Roth, No. 04-cv-0228, 2004 WL 963881, at *2 (E.D. Pa. May 3, 2004) (finding *de minimis* force where inmate was allegedly shoved into cell bars, causing severe bruising to his arms and back); Acosta v. McGrady, No. 96-CV-2874, 1999 WL 158471, at *8-9 (E.D.

Pa. Mar. 22, 1999) (sharply pulling inmate's handcuffed hands behind his back and pushing him into a wall was *de minimis* force); Gutridge v. Chesney, No. 97-CV-3441, 1998 WL 248913, at *3 (E.D. Pa. May 8, 1998) (finding *de minimis* force where inmate was handcuffed and pushed against a wall, suffering a small scratch on his cheek as a result). Summary judgment, therefore, will be granted in favor of Hughes and McHugh and against Lee-Chima on the Eighth Amendment excessive force claims, the only relevant claims that Lee-Chima administratively exhausted.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. An appropriate Order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: March 11, 2025**
20-2349-02

- 28 -